## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**ELIZABETH K. KERWIN, Regional Director**
**Seventh Region of the National Labor Relations Board,**
**for and on behalf of the**
**NATIONAL LABOR RELATIONS BOARD**

               Petitioner

       v.                                     CIVIL Case No. 2:22-CV-12761

**STARBUCKS CORPORATION**

               Respondent

## EXPEDITED CONSIDERATION REQUESTED

## PETITION FOR PRELIMINARY INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

To the Honorable Judges of the United States District Court for the Eastern District of Michigan:

Elizabeth K. Kerwin, Regional Director of the Seventh Region of the National Labor Relations Board [Board], petitions this Court for and on behalf of the Board pursuant to Section 10(j) of the National Labor Relations Act, as amended [61 Stat. 149; 73 Stat. 544; 29 U.S.C. Sec 160(j)] [the Act] for appropriate injunctive relief pending the final disposition of the matters before the Board based upon the Consolidated Complaint issued by the General Counsel of the Board, alleging that Starbucks Corporation [Respondent] has engaged in, and is engaging in, acts and conduct in violation of Section 8(a)(1) and (3) of the Act.  In support, Petitioner respectfully submits:

1.      Petitioner is the Regional Director of Region 7 of the Board, an agency of the United States, and files this petition for and on behalf of the Board.

1

2.      Jurisdiction of this Court is invoked pursuant to Section 10(j) of the Act.  29 U.S.C. Sec 160(j).

3.      On April 11, 2022 and March 23, 2022, Workers United [the Union] pursuant to provisions of the Act, filed with the Board charges in Case 07-CA-293916 and 07-CA-292971, respectively, alleging that Respondent has engaged in, and is engaging in, unfair labor practices within the mearing of Section 8(a)(1) and (3) of the Act. Copies of the charges are attached as Exhibit 1.

4.      The charges were referred to Petitioner as Regional Director of the Seventh Region of the Board.

5.      On June 27, 2022, the General Counsel of the Board, by the Petitioner, on behalf of the Board, pursuant to Section 10(b) of the Act, issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing in Cases 07-CA-292971 and 07-CA-293916.  A copy of the Consolidated Complaint is attached as Exhibit 2.

6.      From August 1-4, 2022, a hearing on the allegations of the Consolidated Complaint was held in Detroit, Michigan before Administrative Law Judge Geoffrey Carter.

7.      On October 7, 2022, Administrative Law Judge Carter issued his Decision on the allegations of the Consolidated Complaint. In his Decision, Administrative Law Judge Carter concluded that Respondent violated Section 8(a)(3) and (1) of the Act by discharging its

employee Hannah Whitbeck because she engaged in union and protected concerted activities. A copy of the Administrative Law Judge's Decision is attached as Exhibit 3.

8.      There is reasonable cause to believe that the allegations in the Consolidated Complaint are true and that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (3) of the Act and affecting commerce within the meaning of Section 2(6) and (7) of the Act.

9.      In support of this Petition, based on information and belief, the Petitioner states that:

a.      At all material times, Respondent has been a corporation with an office and place of business in Seattle, Washington and various locations throughout the United States including a store located at 300 South Main Street, Ann Arbor, Michigan (Ann Arbor store) and has been engaged in operating public restaurants selling food and beverages.

b.      In conducting its operations during the calendar year ending December 31, 2021, Respondent derived gross revenues in excess of $500,000.

c.      In conducting it operations during the calendar year ending December 31, 2021, Respondent purchased and received at its Ann Arbor store products, goods, and materials valued in excess of $5,000 directly from points outside the State of Michigan.

d.      At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

e.      At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the Act.

f.      At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

| | |
|---|---|
| Robert Prince | Store Manager |
| May Gonzalez | Store Manager |
| Erin Lind | Store Manager |
| Brigette Jackson | Regional Director Area 31 |
| Tina Serrano | Regional Vice President |
| Kevin Johnson | Former President and CEO |
| Howard Schultz | President and CEO |

10.     In support of the Petition, based on information and belief, the Petitioner further states that:

a.      About April 11, 2022, Respondent discharged its employee, Hannah Whitbeck.

b.      Respondent engaged in the conduct described in paragraph 9(a) because Hannah Whitbeck was the leading organizer for the Union at Respondent's Ann Arbor store, she assisted and supported the Union and engaged in protected concerted activities, and to discourage its employees from engaging in these activities.

11.     By the conduct described in paragraph 9, Respondent has been discriminating in regard to the hire or tenure or terms and conditions of employment of its employees to discourage membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act.

12.     The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

13.     Upon information and belief, it may be fairly anticipated that, unless enjoined, Respondent will continue to engage in the conduct set forth in paragraph 9, or similar acts, in violation of Section 8(a)(1) and (3) of the Act.

14.     Upon information and belief, unless the continuation of the aforementioned unfair labor practices is immediately restrained, a serious abrogation of the rights guaranteed and the underlying public policies served by the Act will continue.  As a result, the enforcement of important provisions of the Act and of public policy will be impaired before Respondent can be placed under legal restraint through the regular procedures of a Board order and enforcement decree.  Unless injunctive relief is immediately obtained, it is anticipated that Respondent will continue its unlawful conduct during the proceedings before the Board and during subsequent proceedings before a Court of Appeals for an enforcement decree, with the result that employees will continue to be deprived of their fundamental right to organize for the purpose of collective bargaining, as guaranteed in the Act.

15.     Upon information and belief, to avoid the serious consequences set forth above, it is essential, appropriate, just and proper, for the purposes of effectuating the polices of the Act and avoiding substantial, irreparable, and immediate injury to such policies, to the public interest, and to employees of Respondent, and in accordance with the purposes of Section 10(j)

5

of the Act, that, pending the final disposition of the matters involved here pending before the

Board, Respondent be enjoined and restrained from the commission of the acts and conduct

alleged above, similar or related acts or conduct or repetitions thereof.

16.     No previous application has been made for the relief requested herein.

17.     Pursuant to the District Court's Local Rule 7.1, on November 2, 2022, Petitioner,

through counsel, explained the nature of its Petition to Respondent's counsel and its legal basis

and requested, but did not obtain, concurrence in the relief sought.  A copy of the affidavit stating

such is attached as Exhibit 4.

**WHEREFORE**, Petitioner seeks the following relief:

1.     That the Court issue an order directing Respondent to appear before this Court, at

a time and place fixed by the Court, and show cause, if any there be, why an injunction should

not issue enjoining and restraining Respondent, its officers, representatives, agents, employees,

attorneys, and all persons acting in concert or participation with them, pending final disposition

of the matters involved here pending before the Board from:

a.     discharging employees at any of its stores in the United States and its

territories for supporting the Union or any other labor organization;  and

b.      in any like or related manner interfering with, restraining, or coercing

employees in the exercise of the rights guaranteed them under Section 7 of the Act at any of

Respondent's stores in the United States and its territories.

c.     That the Court issue an affirmative order directing Respondent, its

officers, representatives, agents, employees, attorneys, and all persons acting in concert or

participation with it, pending final disposition of the matters involved herein pending before the

Board, to within five (5) days of the issuance of the District Court's order, offer, in writing, to

Hannah Whitbeck, interim reinstatement to her former position, or if that position no longer

exists, to a substantially equivalent position, without prejudice to her seniority or any other rights

and privileges previously enjoyed, displacing, if necessary, any employee hired or reassigned to

replace her;

      d.     Within five (5) days of the District Court's Order, the Respondent shall:

      i.     post physical copies of the District Court's Order at all of Respondent's stores in the United States and its territories, as well as translations in other languages as necessary to ensure effective communication to Respondent's employees as determined by the Petitioner, said translations to be provided by Respondent at Respondent's expense and approved by the Petitioner, on the bulletin board, in all breakrooms, and in all other places where the Respondent typically posts notices to its employees at each of its stores; maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its worksite to monitor compliance with this posting requirement;

      ii.     distribute electronic copies of the District Court's Order, as well as translations in other languages as necessary to ensure effective communication to Respondent's employees as determined by the Petitioner, said translations to be provided by Respondent at Respondent's expense and approved by the Petitioner, to all employees employed by Respondent in the United States and its Territories via the Partner Hub, and all other intranet or internet sites or apps that Respondent uses to communicate with employees;

      iii.     convene one or more mandatory meetings, on working time and at times when Respondent customarily holds employee meetings and scheduled to ensure the widest possible attendance, at Respondent's Main Street, Ann Arbor, Michigan store, during which the District Court's Order will be read to the bargaining unit employees by a responsible Respondent official in the presence of a Board agent, or at Respondent's option, by an agent of the Board in English. Respondent shall also afford the Union, through the Petitioner, reasonable notice and opportunity to have a representative present when the Order is read to employees. Interpreters shall be made available for any individual whose language of fluency is other than English at Respondent's expense. Respondent shall announce the meeting(s) for the Order reading in the same manner it would customarily announce a meeting to employees; the meeting(s) shall be for the

above-stated purpose only. Individuals unable to attend the meeting to which they have been assigned will be able to attend a subsequent meeting during which the same reading shall take place under the same conditions. Respondent shall allow all employees to attend these meetings without penalty or adverse employment consequences, either financial or otherwise;

      iv.    distribute electronic copies of a high-level Respondent official (in the presence of a Board agent) or a Board agent (in the presence of a high-level Respondent official) reading the District Court's Order, on its Partner Hub and all other intranet or internet sites or apps that Respondent uses to communicate with employees, such that the video can be accessed by employees at all of its stores in the United States and its Territories.

     e)    Within twenty one (21) days of the issuance of the District Court's order, file with the Court, with a copy submitted to the Petitioner, a sworn affidavit from a responsible official of Respondent describing with specificity the manner in which Respondent has complied with the terms of this Court's order, including how and where the documents have been posted, and the date(s), time(s), and location(s) that the order was read to employees and by whom.

     f)   That the Court grant such other and further relief as may be just and proper.

Dated this 15th day of November, 2022 in Detroit, Michigan.

Respectfully submitted,

/s/ Elizabeth K. Kerwin
Elizabeth K. Kerwin
Regional Director
National Labor Relations Board, Region 7
Patrick V. McNamara Building
477 Michigan Avenue, Room 05-200
Detroit, MI  48226

ERIKSON C. N. KARMOL,

    Regional Attorney,

    Region Seven

COLLEEN J. CAROL,

 Resident Officer,

 Region Seven


     /s/ Patricia A. Fedewa
     Counsel for Petitioner
     National Labor Relations Board, Region 7
     Patrick V. McNamara Building
     477 Michigan Avenue, Room 05-200
     Detroit, MI  48226
     Telephone: (313)335-8053
     E-Mail:  patricia.fedewa@nlrb.gov
     Bar No. P51964

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

**ELIZABETH K. KERWIN, Regional Director**
**For the Seventh Region of the National Labor Relations Board,**
**for and on behalf of the**
**NATIONAL LABOR RELATIONS BOARD**
               Petitioner

         v.                            CIVIL Case No. 2:22-CV-12761

**STARBUCKS CORPORATION**
               Respondent

<u>**PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES**</u>
<u>**IN SUPPORT OF PETITION FOR PRELIMINARY INJUNCTION**</u>

## I.  STATEMENT OF THE CASE

This case involves Starbucks Corporation's unlawful campaign to defeat its employees

right protected by Section 7 of the National Labor Relations Act to form or join a union.  In

response to the organizing efforts of courageous employees at a Starbucks store in Ann Arbor,

Michigan, and the ongoing nationwide organizing drive, Starbucks retaliated harshly by firing

Hannah Whitbeck (Whitbeck), the lead organizer at the 300 S. Main Street store in Ann Arbor,

Michigan, for Workers United (the Union).  Without a preliminary injunction pursuant to §10(j)

of the National Labor Relations Act, 29 U.S.C. § 160(j), pending final administrative resolution

of the case by the National Labor Relations Board, including the immediate reinstatement of

Whitbeck, Starbucks will achieve its unlawful goals of purging the Ann Arbor store of the

Union's leadership and crushing employee activism in Michigan and nationwide.  In the process,

Starbucks will irreparably harm the statutory rights of its employees, frustrating the Board's

remedial power, and thwarting the intent of Congress.

## II.      PROCEDURAL BACKGROUND

As set forth fully in the Petition for Preliminary Injunction, the Union filed charges with the Board alleging that Starbucks has engaged in unfair labor practices, including the unlawful termination of Whitbeck. [Exh. 1].  After a thorough investigation of the charges and full consideration of Starbucks' proffered evidence, the Petitioner determined there was reasonable cause to believe Starbucks has violated the Act.  The Petitioner issued a Consolidated Complaint and Notice of Hearing on June 27, 2022.[1] [Exh. 2].

From August 1-4, a hearing on the allegations of the Consolidated Complaint was held in Detroit, Michigan before Administrative Law Judge (ALJ) Geoffrey Carter.  On October 7, ALJ Carter issued a Decision on the allegations of the Consolidated Complaint. [Exh. 3]. In his Decision, ALJ Carter concluded that Starbucks violated Section 8(a)(3) and (1) of the Act by discharging Whitbeck because she engaged in union and protected concerted activities [Exh. 3 at 31].

On October 27, Starbucks advised representatives of the Petitioner that it would not comply with ALJ Carter's Decision because it intends to file exceptions to the Decision with the Board in Washington D.C., pursuant to Section 102.46 of the Board's Rules and Regulations.

## III.  STATEMENT OF THE FACTS

### A.  Whitbeck Begins Organizing a Union at an Ann Arbor Starbucks

Starbucks is the world's largest coffeehouse chain, operating approximately 9,000 stores nationwide, including 283 stores in Michigan.  In 2021, the Union commenced an

---

[1] All references are to 2022, unless otherwise noted.

unprecedented, highly publicized campaign to organize Starbucks employees across the country. In January, Whitbeck, an employee at Starbucks' 300 S. Main Street, Ann Arbor, Michigan store (the Main Street store) decided to join the campaign.  Whitbeck contacted the Union and initiated the organizing campaign at the Main Street store. [Exh. 3 at 6].  She openly expressed her support for the Union wearing a button at work every day that said: "Starbucks Workers United." [Exh. 3 at 78].  Whitbeck also spoke with her co-workers about the Union and provided them with information and literature. [Exh. 3 at 6].

On February 4, Whitbeck sent a letter from her personal e-mail address to Starbucks then-President and CEO Kevin Johnson. [Exh. 3 at 6].  The letter described the nationwide organizing effort and explained that a majority of the approximately 20 employees at the Main Street store supported the Union and were requesting that Starbucks recognize the Union as the employees' collective bargaining representative. [Exh. 3 at 6 ].  Starbucks did not respond to Whitbeck's e-mail [Exh 3 at 6].

## B.  Whitbeck Becomes the Face of the Michigan Campaign at Board Hearings and in the Media

Having received no response to their request for recognition, on February 8, the Union filed a petition with the Board on behalf of the employees at the Main Street store asking the Board to conduct a representation election (NLRB Representation Case 07-RC-290295). [Exh. 3 at 7].  Around the same time, the Union also filed election petitions at four additional Starbucks stores in Ann Arbor. [Exh. 3 at 7].  While the Main Street store petition was pending, Whitbeck continued to advocate for the Union. [Exh 3 at 8, 16].  On February 11, she posted a photograph on Instagram expressing her support for seven employees that had been discharged from a Starbucks store in Memphis, Tennessee during the Union's organizing campaign there. [Exh.3 at 8].

On March 2-4, an NLRB pre-election hearing was held in multiple representation cases, including Case 07-RC-290295, the representation case for the Main Street store. [Exh. 3 at 15]. At the hearing, Starbucks challenged the Main Street store petition as well as additional petitions filed for other Starbucks locations in Michigan. [Exh. 3 at 15].   Whitbeck appeared at the hearing and her picture and name were visible during the entire hearing, which was also attended by Starbucks management officials, including Whitbeck's District Manager, Paige Schmehl. [Exh. 3 at 15].

Following the hearing, Whitbeck continued to openly support the Union. [Exh 3 at 16]. In this regard, on March 9, she wrote "Brewing Solidarity" on the public message chalkboard at the Main Street store to allow employees and customers to post messages of support for the Union's organizing drive.[Exh. 3 at 16].  A couple of days later, the Brewing Solidarity heading and notes were removed from the community board. [Exh 3 at 16-17].

On April 7, media outlet MLive published an article on the Union's organizing campaign at Starbucks, reporting that the Washtenaw County Board of Commissioners unanimously passed a resolution in support of employees' organizing efforts in Michigan. [Exh. 3 at 21]. The article quoted Whitbeck several times, including this statement: "At least five area stores … are currently seeking to form unions, Whitbeck said, adding that working conditions and exposure to the public during the COVID-19 pandemic without consistent hazard pay have been 'unacceptable' and are part of what is driving the unionization push." [Exh 3 at 21].

### C.  Starbucks Discharges Whitbeck Shortly After Her Campaign Gains Publicity

On April 11, a few days after the article was published, Whitbeck was working at the Main Street store when she was called into a meeting with new Store Manager May Gonzales and manager Erin Lind.  When Whitbeck arrived at the meeting, Lind handed her a discharge

4

notice and told Whitbeck she was fired. [Exh. 3 at 22].  The discharge notice stated that

Starbucks was terminating Whitbeck's employment after three years[2] for leaving a single

employee (a barista) alone at the Main Street store at the end of her shift without attempting to

contact the store manager or other shift supervisor. [Exh. 3 at 22].

Whitbeck was stunned.  Indeed, in determining that Whitbeck's discharge violated

Section 8(a)(3) of the National Labor Relations Act, the ALJ relied upon the following.   First,

District Manager Paige Schmehl attended a "Sip-In" in support of the area campaigns for three

hours and monitored what individuals were posting on the community board located at the Ann

Arbor Zeeb Road store. The ALJ noted that this supported a finding of animus. Second,

Starbucks' "job aid" provided that a final written warning, as opposed to discharge, is Starbucks'

customary discipline for violating the "two-employee rule." [Exh. 3 at page 28] In this regard,

another employee was issued a final written warning for violating the "two-employee rule" and

putting hands on a coworker while Whitbeck was immediately discharged solely for violating the

"two-employee rule."  [Exh. 3 at 228-29].   Second, Starbucks deviated from its usual

investigation practices when it failed to ask Whitbeck why she left the store and failed to

consider that Starbucks scheduled her to leave when another employee's meal break overlapped

with the end of her shift. (Exh. 3 at 29) Third, Starbucks decided to discharge Whitbeck during

an active and ongoing organizing campaign. (Exh. 3 at 30)

### D.  Whitbeck's Discharge is Reported Nationally and Decapitates the Union Locally

Whitbeck's discharge was widely reported, locally as well as nationally, in multiple news

sources and on social media.[3]   Despite being subject to a threat of termination, on June 15, the

---

[2] Whitbeck was hired in April 2019. [Exh. 3 at 6]

[3] See, e.g., Paul Blest, *Starbucks Just Fired Yet Another Union Organizer*, VICE News (Apr. 12, 2022),
https://www.vice.com/en/article/m7vn8b/starbucks-fired-union-organizer/; Jonah Furman, *Retaliation Can't Stop
Growing Starbucks Union*, Labor Notes, (Apr. 22, 2022), https://labornotes.org/blogs/2022/04/retaliation-cant-stop-

employees at the Main Street store bravely voted to be represented by the Union, and thereafter,

the Board certified the Union as the collective bargaining representative of the Main Street store

employees. [Exh. 4]. However, with Whitbeck's discharge the Union lost its principal advocate

at the store, and after some employee turnover the Union had a difficult time even finding out

who the new workers were, let alone getting them involved in bargaining. [Exh 5] The Union

was only able to recruit an employee to join the bargaining committee when Whitbeck kindly

came back to help out at a store at which she no longer works. [Exh 5]

## IV.  LEGAL STANDARD FOR INJUNCTIVE RELIEF

Section 10(j) of the Act,[4] authorizes United States district courts to grant temporary

injunctions pending the Board's resolution of unfair labor practice proceedings.  Congress

recognized that the Board's administrative proceedings often are protracted.  In many instances,

absent interim relief, an employer could accomplish its unlawful objective before being placed

under any legal restraint, and it could thereby render a final Board order ineffectual.  See *Schaub*

*v. West Michigan Plumbing & Heating, Inc.*, 250 F.3d 962, 970 (6th Cir. 2001); *Levine v. C & W*

*Mining Co., Inc.*, 610 F.2d 432, 436-437 (6th Cir. 1979) (quoting S. Rep. No. 105, 80th Cong.,

1st Sess., 27 (1947), reprinted in I *Legislative History of the Labor Management Relations Act of*

---

growing-starbucks-union; Abby Ellinor, *Starbucks Under Scrutiny for Firing Union Workers*, Her Campus (Apr. 19, 2022), https://www.hercampus.com/school/fsu/961845/; Erica Murphy, *Starbucks Workers in East Lansing and Lansing Township Voted to Unionize This Week*, Fox47 News (June 10, 2022), https://www.fox47news.com/neighborhoods/downtown-old-town-reo-town/some-michigan-starbucks-workers-voted-to-unionize-this-week/; Lindsay Moore, *'I Wanted to Make This Job Worth Having:' Michigan Starbucks Workers Join the Union Fight*, MLive (June 12, 2022), https://www.mlive.com/public-interest/2022/06/i-wanted-to-make-this-job-worth-having-michigan-starbucks-workers-join-the-union-fight.html/.

[4] Section 10(j) (29 U.S.C. § 160(j)) provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

*1947* 433 (Government Printing Office 1985)).  *Accord*: *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 28-29 (6th Cir. 1988).  Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation.  *See Kobell v. United Paperworkers Int'l. Union*, 965 F.2d 1401, 1406 (6th Cir. 1992).

To resolve a Section 10(j) petition, a district court in the Sixth Circuit considers only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act and whether temporary injunctive relief is "just and proper."  *See Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 234-235 (6th Cir. 2003); *Schaub*, 250 F.3d at 969; *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir. 1987); *Glasser v. ADT Sec. Sys., Inc.*, 379 F. App'x 483, 485, n.2 (6th Cir. 2010).  *Accord*: *Chester v. Grane Healthcare Co.*, 666 F.3d 87, 94-100 (3d Cir. 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 850-851, 854 (5th Cir. 2010).

### A.  The "Reasonable Cause" Standard

The Regional Director bears a "relatively insubstantial" burden in establishing "reasonable cause." *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 339 (6th Cir. 2017) (quoting *Ahearn*, 351 F.3d at 237).  In determining whether there is reasonable cause to believe that the Act has been violated, a district court may not decide the merits of the case.  *Id*. See also *Schaub*, 250 F.3d at 969; *Gottfried*, 818 F.2d at 493.  *Accord*: *Chester*, 666 F.3d at 100. Instead, the Regional Director's burden in proving "reasonable cause" is "relatively insubstantial." *See Schaub*, 250 F.3d at 969; *Kobell*, 965 F.2d at 1406; *Levine v. C & W Mining Co., Inc.*, 610 F.2d 432, 435 (6th Cir. 1979).  Thus, the district court must accept the Regional Director's legal theory as long as it is "substantial and not frivolous." *McKinney*, 875 F.3d at 339; *Ahearn*, 351 F.3d at 237; *Fleischut*, 859 F.2d at 29; *Kobell*, 965 F.2d 1407.  *Accord*:

*Chester*, 666 F.3d at 101; *Overstreet*, 625 F.3d at 850, 855. Factually, the Regional Director need only "produce some evidence in support of the petition." *Kobell*, 965 F.2d at 1407. The district court should not resolve conflicts in the evidence or issues of credibility of witnesses, but should accept the Regional Director's version of events as long as facts exist which could support the Board's theory of liability. See *Ahearn*; *Schaub*, 250 F.3d at 969; *Gottfried*, 818 F.2d at 493, 494.

### B. The "Just and Proper" Standard

Injunctive relief is "just and proper" under Section 10(j) where it is "necessary to return the parties to the status quo pending the Board's processes in order to protect the Board's remedial powers under the NLRA." *Kobell*, 965 F.2d at 1410 (quoting *Gottfried*, 818 F.2d at 495).[5] *Accord*: *Schaub*, 250 F.3d at 970. Thus, "[i]nterim relief is warranted whenever the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified or the administrative procedures will be rendered meaningless." *Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982) (quoting *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967)). Accord: *Ahearn*, 351 F.3d at 239; *Fleischut*, 859 F.2d at 30-31; *Chester*, 666 F.3d at 102.

### V. APPLICATION OF LEGAL STANDARD TO THE FACTS

### A. There is Strong Cause to Believe Starbucks Discharged Activist Whitbeck in Retaliation for Her Union Activity in Violation of Section 8(a)(3) of the Act

In this case, the reasonable cause standard is easily met. Following four days of hearing and extensive briefing by the parties, ALJ Carter concluded, based on a preponderance of the evidence, that Starbucks discharged Whitbeck in violation of Section 8(a)(3) of the Act. Many

---

[5] The "status quo" referred to in *Gottfried v. Frankel* is that which existed before the charged unfair labor practices took place. See *Fleischut*, 859 F.2d at 30 n.3.

courts have recognized that an ALJ's findings and legal conclusions supply "a useful benchmark" against which to weigh the strength of a regional director's theories of violation. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001) ("[a]ssessing the Director's likelihood of success calls for a predictive judgment about what the Board is likely to do with the case" and therefore "the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed"); *Ahearn v. Jackson Hospital*, 351 F.3d at 238 (ALJ's decision "lends further support" to district court's findings of "reasonable cause"); *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 337-38 (2d Cir. 1999) (ALJ's decision entitled to "appropriate deference" when evaluating reasonable cause); *Rivera-Vega v. Conagra, Inc.*, 70 F.3d 153, 161 (1st Cir. 1995). Moreover, the "preponderance of the evidence" standard in an ALJ's proceeding sets a higher burden of proof than the "reasonable cause" test in a district court 10(j) proceeding.  It is, therefore, appropriate for a district court to rely on an ALJ's findings and conclusions.  *Ahearn v. Jackson Hospital*, 351 F.3d at 238; *Bloedorn v. Francisco Foods*, 276 F.3d at 288.

As set forth by ALJ Carter in his decision, an employer violates Section 8(a)(3) when it discharges an employee because of their union support.[6]  In cases where an employer's motivation for an adverse personnel action is at issue, the Board utilizes the test outlined in *Wright Line,* 251 NLRB 1083 (1980) *enfd.,* 662 F.2d 800 (1st Cir. 1981), *cert denied,* 455 U.S. 989 (1982) [Exh. 3 at 25].  To establish a violation under *Wright Line,* the Petitioner must establish a prima facie case of discrimination by setting forth evidence that supports an inference that the employee's

---

[6] *See Kentucky Gen., Inc. v. NLRB*, 177 F.3d 430, 435 (6th Cir. 1999); *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995); *NLRB v. Omnitest Inspection Servs., Inc.*, 937 F.2d 112, 122 (3d Cir. 1991).

protected concerted activity was a motivating factor in the adverse employment action.[7] The three elements commonly required to support such a showing are: (1) the employee engaged in protected activity; (2) the employer had knowledge of that activity; and (3) the employer's adverse action was motivated by animosity it harbored against the employee's protected activity.[8] [Exh. 3 at 25].

If the Petitioner makes out a prima facie case, the burden shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even in the absence of the employee's protected activity.[9]  If, however, the evidence establishes the reasons given for the employer's action are pretextual – that is, either false or not in fact relied upon – the employer fails by definition to show that it would have taken the same action for those reasons, and no further analysis is required.[10] [Exh. 3 at 25].

### 1.  Starbucks Was Aware of Whitbeck's Union Activity

In the instant matter, there is no dispute as to Starbucks' knowledge of Whitbeck's open and very public union activity. [Exh. 3 at 27].  Whitbeck initiated the organizing campaign at the Main Street store.  She displayed Union paraphernalia while at work donning a button declaring: "Starbucks Workers United."  Whitbeck spoke with co-workers about the Union and solicited their support.  She then sent a letter to Starbucks' then-CEO from her personal e-mail account announcing that a majority of the Main Street store employees wished to join with co-workers nationwide to support the Union and asking Starbucks to recognize the Union as their bargaining

---

[7] *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777 (6th Cir. 2002).

[8] *See id.* (citing *NLRB v. Gen Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir. 2000)); *see also Case Farms* of *North Carolina*, 353 NLRB 257 (2008), *enforced*, 2010 WL 1255941 (D.C. Cir. 2010).

[9] *FiveCAP, Inc.*, 294 F.3d at 778 (citing *NLRB v. Gen. Sec. Servs. Corp.*, 162 F.3d 437, 442 (6th Cir. 1998)).

[10] *SFO Good-Nite Inn*, 352 NLRB 268, 269 (2008), *enforced* 700 F.3d. 1 (D.C. Cir. 2012).

representative.  Whitbeck attended the videoconference Board hearing in Case 07-RC-290295 on

March 4-5.  Whitbeck also sought support for the unionization effort from Starbucks' customers

by writing "Brewing Solidarity" on the public chalkboard at the Main Street store. To further

garner the public's support, Whitbeck spoke with the press about the Union's campaign and was

quoted in both local and national media outlets.

### 2.   Starbucks Was Hostile Towards the Union Effort

As to the third element of the *Wright Line* test, employer animus, Starbucks' hostility

toward its employees' protected activities is apparent from statements made at the corporate

level.  Starbucks' CEO has made clear his sentiment about the unionization efforts.[11]  In this

context, District Manager Paige Schmehl's removal of Whitbeck's pro-union messages at the

Main Street store and the timing of Whitbeck's discharge strongly support an inference of

discriminatory motive.[12]  Starbucks' animus is further demonstrated by Manager Schmehl's

surveillance of its employees' union activities on March 20, including her removal of pro-union

messages from the community board at one of its stores. [Exh. 3 at 28].

### 3.   Starbucks Ignored its Own Policies and Past Practices in Order to Discharge Whitbeck

As found by ALJ Carter, Starbucks' unlawful animus toward Whitbeck is most starkly

revealed by its disparate treatment of Whitbeck.[13] [Exh. 3 at 28-30].   Starbucks' internal

---

[11] A few days after discharging Whitbeck, Starbucks CEO Howard Schultz publicly discussed new benefits he planned for employees at non-unionized stores. See New York Times, *"Starbucks Chief Talks of Nonunion Staff Benefits"* article dated April 14, 2022.

[12] *See Kentucky Gen.*, 177 F.3d at 436–37 (short time lapse between employees' union activity and layoff, as well as employer awareness of employees' union activity, bolsters finding that layoffs were discriminatorily motivated); *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 959–60 (2d Cir. 1988) (timing makes unlawful motivation "'stunningly obvious'"); *NLRB v. Sutherland Lumber Co.*, 452 F.2d 67, 69 (7th Cir. 1971) ("The abruptness of a discharge and its timing are persuasive evidence as to motivation.").

[13] *See W.F. Bolin Co.*, 70 F.3d at 870–71; *Electrolux Home Products, Inc.*, 368 NLRB No. 34, slip op. at 3.

policies indicate that when an employee violates the two-employee rule (i.e., leaves a single employee alone at a store), the customary level of discipline is a final written warning, not termination. [Exh. 3 at 28]. Indeed, the ALJ found no evidence in the record that Starbucks has ever discharged anyone in Michigan (besides Whitbeck) for violating the two-employee rule. [Exh. 3 at 30]. In this regard, evidence adduced at the hearing shows that a previous shift supervisor had left employees working alone multiple times and was never discharged for it, while Whitbeck, a model employee with no prior discipline, was discharged for her first violation.[14] [Exh. 3 at 28-29]. Moreover, Starbucks deviated from its established policy and usual practices when investigating employee misconduct by failing to ask Whitbeck to explain why she could not stay at the store past the end of her shift on February 27, even though Whitbeck had stated in her incident report that she had to leave for "something serious." [Exh. 3 at 29]. Together, these incongruities leave no doubt as to Starbucks's discriminatory motive.

### 4. Starbucks Cannot Show it Would Have Discharged Whitbeck Absent Her Union Activity

Having found that the General Counsel established its initial burden of establishing a causal relationship between Whitbeck's union activity and Starbucks' decision to discharge her, ALJ Carter turned to Starbucks' proffered affirmative defense. [Exh. 3 at 30]. Starbucks argued that it would have discharged Whitbeck notwithstanding her protected union activity because she "knowingly" violated the two-employee rule. [Exh. 3 at 30]. However, ALJ Carter rejected Starbucks' defense finding that Starbucks did not present any evidence that a "knowing" violation of the two-employee rule justified discharge as the customary level of discipline. [Exh.

---

[14] *See Id.* at 871 (confirming that employer deviation from past practice may be a basis to infer discriminatory motive); *NLRB v. General Fabrications Corp.,* 222 F.3d 218, 227 (6th Cir. 2000) (absenteeism was pretext for employee's discharge).

3 at 30]. Notably, ALJ Carter cited Starbucks' policy which clearly states that a final written

warning, *not discharge*, is the appropriate penalty, as well as the absence of evidence that

Starbucks discharged anyone in Michigan, *besides Whitbeck*, for violating the two-employee

rule. [Exh. 3 at 31].

In sum, based on the evidence adduced after a full hearing before ALJ Carter, there is

reasonable cause to believe that Starbucks violated the Act by discharging Whitbeck and

Petitioner's likelihood of success before the Board is high.

### B. Interim Injunctive Relief is Just and Proper to Prevent Irreparable Injury to the Employees' Statutory Rights and the Board's Remedial Power

Congress has declared that "encouraging . . . collective bargaining" is the "policy of the

United States."[15] Section 7 of the Act grants employees the decision "to bargain collectively

through representatives of their own choosing."[16] Making that choice "without restraint or

coercion by their employer" is a "fundamental right."[17] Starbucks' unlawful discharge of

Whitbeck threatens irreparable harm to the national labor policy of encouraging collective

bargaining embodied in Section 1 of the Act, obliterates employees' right to organize under

Section 7 of the Act, and threatens the efficacy of the Board's ultimate remedial order. Over

time, without an immediate injunction requiring interim reinstatement of Whitbeck, these harms

will become irreparable, and the Board's final order will be ineffective. In short, Starbucks will

---

[15] 29 U.S.C. § 151.

[16] 29 U.S.C. § 157. *See NLRB v. Transportation Management Corp.,* 462 U.S. 393, 397 (1983) ("Employees of an employer covered by the NLRA have the right to form, join, or assist labor organizations.").

[17] *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937). *See also National Cash Register Co. v. NLRB,* 466 F.2d 945, 959 (6th Cir. 1972) ("the policy of the NLRA is to 'insulate employees' jobs from their organizational rights.'") (citing *Scofield v. NLRB*, 394 U.S. 423, 429 n. 5 (1969), quoting *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40 (1954)).

succeed in forever undermining the Union's ability to bargain at the Main Street store, and chill organizing in the rest of Michigan and throughout the country.

Starbucks' unlawful discharge of Whitbeck threatens to both undermine the collective bargaining process at the Main Street store and irreparably harm its employees' organizing effort nationwide by extinguishing employee support for the Union.[18] Where the Union is already certified, employee support is vital to a union's ability to bargain effectively.[19] Without it, the union has no leverage and is hard-pressed to secure improvements in wages and benefits at the bargaining table.[20] Indeed, many courts, including the U.S. Court of Appeals for the Sixth Circuit, have recognized that the discriminatory discharge of a union activist predictably chills union support and interferes with collective bargaining.[21] Where the Union is still organizing,

---

[18] *See McKinney v. Starbucks Corp.*, 2022 U.S. Dist. LEXIS 181091 at *56-66 (W.D. Tenn. Aug. 18, 2022) (interim reinstatement just and proper to preserve ability to bargain effectively for a first contract and remove chilling impact on organizing at stores nationwide), *stay pending appeal denied* 2022 U.S. App. LEXIS 24999 (6th Cir. Sept. 6, 2022).

[19] *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226–27 (6th Cir. 1993); *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990) (recognizing that erosion of employee support jeopardizes union's ability to represent employees). *Accord Chester v. Grane Healthcare Co.*, 666 F.3d 87, 102–03 (3d Cir. 2011); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996); *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1193 (9th Cir. 2011); *I.U.E. v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970).

[20] *Ahearn v. Jackson Hospital Corp.*, 351 F.3d 226, 239 (6th Cir. 2003) (interim reinstatement of illegally discharged employees under Section 10(j) just and proper to allow union to effectively bargain for a first contract, as the bargaining unit in that context is "highly susceptible to management misconduct"); *Gottfried v. Frankel*, 818 F.2d 485, 495–96 (6th Cir. 1987) (just and proper to reinstate union supporters, including members of the bargaining committee, who were discharged during and after contract bargaining); *Moore-Duncan v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390, 396 (E.D. Pa. 2001). *See also Duffy Tool & Stamping, L.L.C. v. NLRB*, 233 F.3d 995, 998 (7th Cir. 2000) ("By undermining support for the union, the employer positions himself to stiffen his demands . . . knowing that if the process breaks down the union may be unable to muster enough votes to call a strike.").

[21] *See Ahearn v. Jackson Hosp. Corp.*, 351 F.3d at 239; *Pye v. Excel Case Ready*, 238 F.3d 69, 74–75 (1st Cir. 2001); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980); *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 880 (3d Cir. 1990); *Electro-Voice*, 83 F.3d at 1572–73; *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988), *overruled on other grounds by Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994); *Sharp v. Webco Indus., Inc.*, 225 F.3d 1130, 1135 (10th Cir. 2000); *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 373–74 (11th Cir. 1992).

such a discharge may effectively nip an organizing campaign in the bud absent interim relief, a

point also recognized by the Sixth Circuit and other courts.[22] The U.S. District Court for the

Eastern District of Michigan has also held that an injunction is warranted to avoid the irreparable

harm to Section 7 rights threatened by such discharges.[23] Immediately, the termination removes a

union supporter from the workplace and bargaining process, and can create a leadership void.[24]

Moreover, other employees, especially those who were undecided about organizing, will often

refrain from supporting the union for fear of also losing their jobs.[25] Accordingly, multiple

Courts of Appeals, including the Sixth Circuit, have endorsed inferences of irreparable harm

based on the unlawful discharges themselves.[26] The risk of irreparable harm is even more acute

---

[22] *See Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001); *Pye v. Excel Case Ready*, 238 F.3d at 74-75; *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1053; *NLRB v. Electro-Voice, Inc.*, 83 F.3d at 1572–73; *Aguayo v. Tomco Carburetor Co.*, 853 F.2d at 749 *Sharp v. Webco Indus., Inc.*, 225 F.3d at 1135.

[23] *See Gottfried v. Mayco Plastics, Inc.*, 472 F. Supp. 1161, 1166 (E.D. Mich. 1979) (nip-in-the-bud discharges), *aff'd mem.*, 615 F.2d 1360 (6th Cir. 1980).

[24] *See Gottfried v. Frankel*, 818 F.2d at 489, 495–96 (discharged chief steward played important role in developing union support);") *Electro-Voice*, 83 F.3d at 1573 (organizers' "absence deprives the employees of the leadership they once enjoyed"); *Arlook*, 952 F.2d at 370 (discharged employees included "lodestars of the initial organizational efforts"); *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 907 (3d Cir. 1981) (exclusion of union supporters from bargaining process during pendency of administrative proceedings would likely undermine union's position).

[25] *See United Servs. for the Handicapped v. NLRB*, 678 F.2d 661, 665 (6th Cir. 1982) (discharge of union supporters has an inhibitive "continuing effect" on the remaining employees); *Pye*, 238 F.3d at 74 ("discharge of active and open union supporters . . . risks a serious adverse impact on employee interest in unionization"); *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 576 (2d Cir. 1988) ("Employees are certain to be discouraged from supporting a union if they reasonably believe it will cost them their jobs."); *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212-13 (2d Cir. 1980) (discharge of union adherents may reasonably "remain in [employees'] memories for a long period"); *Electro-Voice*, 83 F.3d at 1573 ("[T]he employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them.").

[26] *See Schaub*, 250 F.3d at 971; *Ahearn v. Jackson Hospital Corp.*, 351 F.3d at 239. *See also Frankl v. HTH Corp. (Frankl I)*, 650 F.3d 1334, 1363 (9th Cir. 2011) ("likelihood of success" in proving discriminatory discharge of union activists during organizing drive "largely establishes" likely irreparable harm, absent unusual circumstances); *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967) (independent evidence of irreparable harm not required because illegal discharges during an organizing campaign "operate predictably to destroy or severely inhibit employee interest in union representation, and activity toward that end"). *Cf. Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297–98 (7th Cir. 2001) (interim instatement of employees illegally refused hire just and proper even where "the Director chose not to make an independent case on irreparable harm"). *See also NLRB v. Link-Belt Co.*, 311 U.S.

where, as here, a newly established union is attempting to bargain for a first contract,[27] and is further engaging in a nationwide organizing effort at a large number of Starbucks stores, which has garnered significant media coverage.[28]

Whitbeck's discharge is having these severe negative effects. First, her loss has removed the Union's chief activist and supporter at the small store, making it difficult for the Union to even contact workers there, let alone enlist them in becoming active participants in bargaining or Union matters. Second, Whitbeck's discharge inherently and irreparably chills Starbucks employees' both at the Main Street store and nationwide in exercising their rights under the Act.[29] Both social and news media have enabled employees working at far-flung locations to interact and organize collaboratively, and concomitantly, such that the actions of Starbucks at one location necessarily influence employee sentiment and conduct at another. Whitbeck's

---

584, 598 (1941) (discharge of activists during organizing campaign "effectively . . . restrain[ed] the employees' choice" and "tend[ed] to have as potent an effect as direct statements to the employees that they could not afford to risk selection of [the union]."); *Power Inc. v. NLRB,* 40 F.3d 409, 423 (D.C. Cir. 1994) (holding that the Board properly "concluded that it is 'difficult to imagine any act of management better calculated to chill union support'" than illegal discharges); *NLRB v. Longhorn Transfer Serv., Inc.*, 346 F.2d 1003, 1006 (5th Cir. 1965) ("the discharge of a leading union advocate is a most effective method of undermining a union organizational effort").

[27] *See Ahearn v. Jackson Hospital Corp.*, 351 F.3d at 239; *Arlook*, 952 F.2d at 373 (bargaining units are "highly susceptible to management misconduct" where union was recently certified and employees are bargaining for first contract); *Pascarell*, 904 F.2d at 880-81; *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500-01 (7th Cir. 2008); *Lindsey v. Shamrock Cartage, Inc.*, 2018 WL 6528432 *5 (S.D. Ohio 2018) ("in its infancy and bargaining for a first contract, the Union is particularly susceptible to harm if [the discharged activist] is not reinstated").

[28] *McKinney v. Starbucks Corp.*, 2022 U.S. Dist. LEXIS 181091 at *56-66 (W.D. Tenn. Aug. 18, 2022), *stay pending appeal denied* 2022 U.S. App. LEXIS 24999 (6th Cir. Sept. 6, 2022).

[29] *See Ahearn v. Jackson Hosp. Corp.,* 351 F.3d at 239 ("multiple terminations . . . have an inherently chilling effect on other employees"); *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 233−34 (6th Cir. 2000) (suspending and discharging union supporters results in a situation where a "fair election cannot be held"); *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 244 (6th Cir. 1983) (discharge of employees who participated in a walkout in early stage of union campaign "would clearly 'have a tendency to undermine the majority's strength and impede the election process'"); *United Servs. for Handicapped*, 678 F.2d at 665 (discharge of union supporters has an inhibitive "continuing effect" on the remaining employees, "strongly supports a conclusion that the fair election process has been tainted"); *Angle*, 382 F.2d at 660 (court inferred irreparable harm from the nature of the violation, where the employer discharged six employees).

discharge was highly publicized by local news media, on social media, and by national news outlets. In the context of a nationwide organizing campaign, the highly publicized discharge of a key Union activist speaks for itself. Given the significant publicity, the chilling impact of this discharge and others has spread to other stores across the country, creating fear among employees, causing workers in Michigan and elsewhere to fear exercising their Section 7 rights.

The faith of Starbucks employees nationwide in workplace democracy will not be restored unless Whitbeck is immediately reinstated under the protection of an interim injunction. "[I]n the labor field, as in few others, time is crucially important in obtaining relief."[30] The final Board reinstatement order cannot revive employee interest in unionization because it will not come until years after the discharge[31]—too late to erase its chilling effect.[32] While the Main Street store's employees still voted for the Union in the immediate aftermath of the discharge, by the time the Board order issues they will have seen a Union leader who "attempted to exercise rights protected by the Act had been discharged" and waited for "years to have their rights vindicated."[33] The discriminatee will have experienced a prolonged absence from the workplace as a result of organizing activity.[34] Both the remaining and reinstated employees will reasonably

---

[30] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

[31] *See, e.g.*, *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) (noting the "notoriously glacial" pace of Board proceedings).

[32] *See Pye*, 238 F.3d at 75 (unremedied interference with unionization effort "would make the Board's remedial process ineffective simply because it is not immediate"); *Electro-Voice*, 83 F.3d at 1573 ("As time passes, . . . the spark to organize is extinguished.").

[33] *Silverman v. Whittall & Shon, Inc.*, 1986 WL 15735, at *1 (S.D.N.Y. 1986). *See also McKinney v. Starbucks Corp.*, 2022 U.S. Dist. LEXIS 181091, at *56–66 (W.D. Tenn., Aug. 18, 2022) (finding reinstatement just and proper despite election victory), *stay pending appeal denied* 2022 U.S. App. LEXIS 24999 (6th Cir. Sept. 6, 2022).

[34] *See Pascarell v. Vibra Screw Inc.*, 904 F.2d at 881 (even if open union supporters are "ultimately reinstated by the Board . . . [e]mployees will not risk the uncertainty and hardship attendant upon even temporary lay-off if that is the price they must pay for union activity"); *Angle*, 382 F.2d at 660-61 (when the Board finally acts, "the employees then at the plant may not wish to exercise the rights thus secured to them"); *Asseo v. Bultman Enters., Inc.*, 913 F. Supp. 89, 97 (D.P.R. 1995) ("Even those who remain willing to accept employment [under a final Board order] may

view the Union as ineffective in protecting them.[35] At that point, no worker in their "right mind" will support the Union.[36] Thus the Union will be prevented from organizing at other stores, will not have the support it needs to bargain effectively at this store,[37] and may ultimately be ousted by disaffected employees or forced to disclaim representation.[38] This is exactly the type of irreparable harm Section 10(j) is designed to address.[39] Furthermore, by the time the Board can act, the discriminatee will likely have taken another job and be unavailable for reinstatement, itself an irreparable injury to the unionization effort.[40] As time passes, momentum wanes, and the still-discharged employee portends a particularly acute nationwide chilling impact on employees at other stores weighing the cost of supporting the Union. Thus, Starbucks will

---

be inclined to withdraw their support of the Union because of its inability to adequately represent their interests . . . .").

[35] *See Asseo v. Bultman Enterprises, Inc.*, 913 F. Supp. at 97 ("Even those who remain willing to accept employment may be inclined to withdraw their support of the Union because of its inability to adequately represent their interests . . . ."); *Pascarell*, 904 F.2d at 881 (even if open union supporters are "ultimately reinstated by the Board . . . [e]mployees will not risk the uncertainty and hardship attendant upon even temporary lay-off if that is the price they must pay for union activity"); *Angle*, 382 F.2d at 660-61 (when the Board finally acts, "the employees then at the plant may not wish to exercise the rights thus secured to them"); *cf. NLRB v. Hardesty Co.*, 308 F.3d 859, 865 (8th Cir. 2002) (employer's unilateral changes to working conditions will "often send the message to the employees that their union is ineffectual, impotent and unable to represent them").

[36] *Silverman*, 1986 WL 15735, *1.

[37] *See* cases cited *supra* notes 19-21.

[38] *Silverman*, 1986 WL 15735, *1.

[39] *Pye*, 238 F.3d at 75.

[40] *Id.*; *accord Electro-Voice*, 83 F.3d at 1573; *Aguayo,* 853 F.2d at 749.

succeed in permanently frustrating the employees' right to freely choose union representation.[41]

The Board's order will be an "empty formality."[42]

      Immediate reinstatement of the discriminatee offers the best chance of avoiding this

unjust result.[43] Because fear of retaliation may completely extinguish employee willingness to

support the Union both here and at other stores by the time a Board order issues, interim

reinstatement is necessary now to erase the chill before it is too late to prevent remedial failure

on a nationwide scale.[44] It will mitigate the chilling effect on the organizing campaign by

sending an affirmative signal that the Union, the Board, and the courts will *timely* protect

Starbucks employees if they face retaliation for supporting the Union.[45] Indeed, the discriminatee

---

[41] *Cf. Radio Officers' Union v. NLRB*, 347 U.S. 17, 40 (1954) ("The policy of the Act is to insulate employees' jobs from their organizational rights. . . . to allow employees to freely exercise their right to join unions . . . without imperiling their livelihood."); *Jones & Laughlin Steel Corp.*, 301 U.S. at 34 ("collective action would be a mockery if representation were made futile by interference with freedom of choice.").

[42] *Angle*, 382 F.2d at 660.

[43] *Schaub*, 250 F.3d at 971 (interim reinstatement of discharged union activist "combats the substantially diminished prospects of unionizing [the employer] if [the discriminatee] were not to return until after the Board reached a final resolution of th[e] case"); *Angle*, 382 F.2d at 661 (interim reinstatement is "best visible means" of rectifying chill of protected activity); *Frye*, 10 F.3d at 1226-27 ("employee support would erode to such an extent that the Union could no longer represent those employees," rendering a final Board remedy "ineffective") (quoting *Centro Medico*, 900 F.2d at 454); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 27 (1st Cir. 1986) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.").

[44] *See Schaub*, 250 F.3d at 971 (interim reinstatement of one employee organizer); *Ahearn v. Jackson Hospital Corp.*, 351 F.3d at 239 (interim reinstatement of three employees); *Pye*, 238 F.3d at 75 (interim reinstatement of five employee organizers held just and proper); *Sharp*, 225 F.3d at 1135 (six union supporters); *Aguayo*, 853 F.2d at 746, 749 (eleven members of organizing committee); *Angle*, 382 F.2d at 660-61 (four employee organizers); *Silverman*, 1986 WL 15735, *1 (six union activists); *Hooks*, 775 F. Supp. 2d at 1054 (three activists); *McKinney v. Starbucks Corp.*, 2022 U.S. Dist. LEXIS 181091, at *56–66 (W.D. Tenn., Aug. 18, 2022) (seven unlawfully fired activists ordered reinstated), *stay pending appeal denied* 2022 U.S. App. LEXIS 24999 (6th Cir. Sept. 6, 2022).

[45] *See Schaub*, 250 F.3d at 971; *Pye*, 238 F.3d at 75 (interim reinstatement of union supporters appropriate to preserve "spark to unionize"); *Kaynard*, 625 F.2d at 1053 (reinstatement of "active and open" union supporters just and proper to avoid "serious adverse impact on employee interest in unionization"); *Pascarell*, 904 F.2d at 881 (interim reinstatement just and proper to counteract clear message that "if one is associated with the union, one will be disciplined"); *Arlook*, 952 F.2d at 374 (interim reinstatement just and proper to preserve "Board's ability to foster

still desires reinstatement and wishes to take an active role in bargaining. As noted, although employees voted for the Union in May, they are acutely aware that the discriminatee is not back at the store despite the passage of time and the running of an election, a clear sign that they will not be timely protected if they are retaliated against. Seeing the discriminatee immediately reinstated will send a signal to current employees at the Main Street store, as well as to employees at other stores across the country that the Union is currently organizing, that they need not fear openly supporting the Union because their rights will be effectively upheld. Thus, interim reinstatement of Whitbeck will not only preserve and restore the legitimate level of support and leadership necessary for effective bargaining in Ann Arbor,[46] it protects the ongoing union organizing campaigns at Starbucks stores nationwide from unlawful interference.[47]

Starbucks will suffer little, if any, harm if injunctive relief is granted. Upon interim reinstatement, Starbucks will have the benefit of an experienced employee,[48] whose statutory rights outweigh any employment rights of any replacement employees,[49] and it will retain its

---

peaceful labor negotiations"); *NLRB v. Ona Corp.*, 605 F. Supp. 874, 886 (N.D. Ala. 1985) (interim reinstatement of single discriminatee in large unit will send "affirmative signal").

[46] *See Ahearn v. Jackson Hospital Corp.*, 351 F.3d at 239; *Moore-Duncan v. Aldworth Co.*, 124 F. Supp. 2d 268, 294 (D.N.J. 2000) (reinstatement "will allow unlawfully terminated employees to again become part of the bargaining process").

[47] *See Schaub*, 250 F.3d at 971; *McKinney v. Starbucks Corp.*, 2022 U.S. Dist. LEXIS 181091, at *56–66 (W.D. Tenn., Aug. 18, 2022), *stay pending appeal denied* 2022 U.S. App. LEXIS 24999 (6ᵗʰ Cir. Sept. 6, 2022); *Kobell v. United Refining Co.*, 1998 WL 794860, at *9 (W.D. Pa. 1998) ("It is not unreasonable to infer that the potential violations send a strong signal to the Company's non-unionized employees who will fear retribution should they attempt to organize.").

[48] *See Eisenberg*, 651 F.2d at 906.

[49] *See Aguayo*, 853 F.2d at 750; *Pye*, 238 F.3d at 73, 75.

managerial right to impose lawful discipline.[50] In fact, interim reinstatement helps reduce

Starbucks' ultimate financial liability because it cuts off any continued accrual of backpay.[51]

The other requested relief is also just and proper. A cease-and-desist order is "a standard

part of a [Section] 10(j) preliminary injunction."[52] Reading of the district court's order in front of

the employees and a representative of the Board is an "effective but *moderate* way to let in a

warming wind of information and, more important, reassurance."[53] Relatedly, posting the order

during the pendency of the administrative proceedings will further inform and reassure

employees of their rights.[54]

Moreover, it is just and proper to seek a nationwide cease-and-desist order that would be

applicable to all Starbucks facilities across the country.[55] The order would prohibit Starbucks

from engaging in like or related illegal conduct at any of its stores, particularly discharges to

suppress union activity. Given the number and pattern of Starbucks' unfair labor practices here

and elsewhere, particularly discharges, a nationwide cease-and-desist order is necessary to halt

---

[50] *See Eisenberg*, 651 F.2d at 906; *Electro-Voice*, 83 F.3d at 1573; *Pye*, 238 F.3d at 75.

[51] *See Hubbel v. Patrish LLC*, 903 F. Supp. 2d 813, 818 (E.D. Mo. 2012).

[52] *Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42, 45 (2d Cir. 2017) (summary order); *see also, e.g.*, *Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1052 (W.D. Tenn. 2011) (cease-and-desist order appropriate "to prevent irreparable chilling of support for the Union among employees and to protect the NLRB's remedial powers.").

[53] *United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 788-89 (9th Cir. 2017); *see also Hadsall*, 2020 WL 4569177, at *12; *Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206-07 (D. Haw. 2010) (ordering reading of court order), *aff'd*, 650 F.3d 1334 (9th Cir. 2011); *Fernbach v. Sprain Brook Manor Rehab, LLC*, 91 F. Supp. 3d 531, 550 (S.D.N.Y. 2015); *Rubin v. Vista del Sol Health Services, Inc.*, 2015 WL 306292, at *2 (C.D. Cal. Jan. 22, 2015); *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 932 (D. Ariz. 2014); *Calatrello v. Gen. Die Casters, Inc.*, 2011 WL 446685, at *8 (N.D. Ohio Jan. 11, 2011).

[54] *See, e.g.*, *Hooks*, 775 F. Supp. 2d at 1054 (ordering posting).

[55] The Board is currently seeking a similar nationwide cease-and-desist order against Starbucks under Section 10(j) in *Leslie v. Starbucks Corp.*, 1-22-cv-00478-JLS in the Western District of New York, and may seek it in future Section 10(j) cases involving Respondent.

Starbucks' systemic campaign of retaliation. In addition to the ALJ's decision in this case

finding that Starbucks violated the Act by discharging Whitbeck in Ann Arbor, M.I., in Cases

15-CA-290336 et al. arising in Memphis, T.N., the U.S. District Court for the Western District of

Tennessee recently ordered Starbucks to reinstate seven fired employees on an interim basis

under Section 10(j) (*McKinney v. Starbucks Corp.*, 2022 U.S. Dist. LEXIS 181091 (W.D. Tenn.,

Aug. 18, 2022), *appeal pending* 22-5730, *stay pending appeal denied* 2022 U.S. App. LEXIS

24999 (6th Cir. Sept. 6, 2022) and, to date, the General Counsel has also issued complaints

against Starbucks in discharge cases in Buffalo, N.Y. (Cases 03-CA-285671 et al., where a

Section 10(j) proceeding is underway), Overland Park, K.S. (Cases 14-CA-290968 et al., where

the ALJ's decision finding that Starbucks violated the Act issued Oct. 12, 2022), Phoenix, A.Z.

(Cases 28-CA-289622 et al., where a Section 10(j) petition was denied), Seattle, W.A. (Cases 19-

CA-293492 et al.), Marysville, W.A. (Cases 19-CA-296261 et al.), Great Neck, N.Y. (Cases 29-

CA-292741 et al.), San Antonio, T.X. (Cases 16-CA-296159 et al.), Wilmette, I.L. (Case 13-CA-

297565); Madison, W.I. (Cases 18-CA-295458 et al.), Richmond, V.A. (Case 05-CA-296459),

another in Buffalo, N.Y. (Cases 03-CA-295810 et al.), and Denver, C.O. (Cases 27-CA-290551

et al.). In total, the General Counsel is prosecuting 14 complaints against Starbucks over 34

unlawfully discharged employees across the country, and additional cases are still under

investigation. Notwithstanding these allegations of unlawful conduct by Starbucks at its facilities

around the country, the Union continues its nationwide organizing effort. Further unlawful

coercion by Starbucks in those campaigns, including discharges, "is to be anticipated from the

course of conduct in the past."[56] Thus, unless restrained by an interim order nationwide in scope,

---

[56] *NLRB v. Express Publishing Co.*, 312 U.S. 426, 435–37 (1941); *D'Amico v. United States Service Industries, Inc.*, 867 F. Supp. 1075, 1087 (D.D.C. 1994) (asserted recidivism and employer's anti-union public statements suggest unlawful conduct will not cease in the absence of an injunction).

Starbucks is likely to continue to discharge employees during organizational campaigns. Such conduct would frustrate the public interest in allowing employees the fullest freedom to organize and to decide whether to bargain collectively.

The cease-and-desist decree should be accompanied by a national posting of the district court's order at all Starbucks facilities, in order to fully apprise employees of their statutory rights and the protections being afforded by the court's order.[57] A nationwide posting is warranted to send an affirmative signal to all of the employees that the kind of violations engaged in thus far by Starbucks during ongoing nationwide organizing drives will no longer be tolerated and to reassure them that they are free to support and/or vote for the Union without fear of further coercion or discrimination.

Finally, the Petitioner did not unduly delay the injunction proceeding by waiting for the administrative law judge to issue a decision. The courts have routinely granted or affirmed Section 10(j) relief following the issuance of a favorable administrative law judge decision in the underlying administrative proceeding where, as here, such relief is in the public interest and can prevent further harm to employee statutory rights pending a decision by the Board, recognizing that the administrative law judge's fact-finding and conclusions can support both reasonable cause and the need for injunctive relief.[58]

---

[57] *Decaturville Sportswear Co. v. NLRB*, 406 F.2d 886, 889 (6th Cir. 1969) (geographic scope of Board order need not be limited where the company instituted a "system-wide and centrally coordinated movement to commit unfair labor practices"); *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 960-61 (2d Cir. 1988), *cert. denied* 490 U.S. 1118 (1989) (corporate-wide order enforced where, *inter alia*, there was centralized labor relations policy).

[58] *See Ahearn v. Jackson Hospital Corp.*, 351 F.3d 226, 238 (6th Cir. 2003) (ALJ's ruling "lends further support to the validity of the district court's decision"); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1363–64 (9th Cir. 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d at 856 (ALJ's fact-finding aided adjudication of the injunction petition); *Muffley*, 570 F.3d at 544-45. *See also Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001); *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 337-38 (2d Cir. 1999); *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 161 (1st Cir. 1995); *Glasser v. Heartland-University of Livonia, MI, LLC*, 632 F.Supp.2d 659, 674–75 (E.D. Mich. 2009).

In sum, interim relief will vindicate the statutory rights of Starbucks employees, both in Ann Arbor and nationwide, to a free choice regarding unionization, and will preserve the Board's remedial power. In addition, it will serve the public interest by effectuating the will of Congress and ensuring that Starbucks' unfair labor practices do not permanently succeed.[59]

Dated this 15th day of November, 2022 in Detroit, Michigan.

Respectfully submitted,

/s/ Elizabeth K. Kerwin
Elizabeth K. Kerwin
Regional Director
National Labor Relations Board, Region 7
Patrick V. McNamara Building
477 Michigan Avenue, Room 300
Detroit, MI 48226

/s/ Patricia A. Fedewa
Patricia A. Fedewa
Counsel for Petitioner
National Labor Relations Board, Region 7
Patrick V. McNamara Building
477 Michigan Avenue, Room 300
Detroit, MI 48226
Telephone: (313)335-8053
E-Mail: patricia.fedewa@nlrb.gov
Bar No. P51964

---

[59] *See Frankl I*, 650 F.3d at 1365 ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed . . . ."); *Pye*, 238 F.3d at 75 ("Section 10(j) interim relief is designed to prevent employers from using unfair labor practices in the short run to permanently destroy employee interest in collective bargaining."); *Asseo v. Pan Am. Grain Co.*, 805 F.2d at 28 ("[T]he public has an interest in ensuring that the purposes of the Act be furthered.").

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

**ELIZABETH K. KERWIN, Regional Director**
**Seventh Region of the National Labor Relations Board,**
**for and on behalf of the**
**NATIONAL LABOR RELATIONS BOARD**

Petitioner

v.                                                              CIVIL Case No. 2:22-CV-12761

**STARBUCKS CORPORATION**

Respondent

_____/

**<u>CERTIFICATION OF SERVICE</u>**

The undersigned, on behalf of the Petitioner,  hereby certifies that she served Starbucks Corporation, with copies of the Petition for Preliminary Injunction Under Section 10(j) of the National Labor Relations Act (including its Exhibits 1-5) and Brief in Support in the above-captioned matter by sending same to its counsel of record in the underlying administrative proceeding, via electronic mail at his business address on this 15th day of November, 2022.

Erik Hult, Esq.
ehult@littler.com

Kevin Kraham, Esq.
kkraham@littler.com

Laura Spector, Esq.
lvspector@littler.com

Respectfully submitted,

/s/  Patricia Fedewa
Counsel for Petitioner
National Labor Relations Board
Region 7
477 Michigan Ave., Suite 5-200
Detroit, MI 48226
(313)335-8053
Patricia.Fedewa@nlrb.gov